IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 19, 2020

## STATE OF TENNESSEE v. ADONIS DONNELL HOLBROOKS

**Appeal from the Criminal Court for Davidson County**
**No. 2018-A-33       Mark J. Fishburn, Judge**

———————————————————

### No. M2019-02099-CCA-R3-CD

———————————————————

Adonis Donnell Holbrooks, Defendant, was indicted by the Davidson County Grand Jury in a superseding indictment for one count of attempted rape of a child, one count of solicitation of a minor, one count of especially aggravated sexual exploitation of a minor, and one count of sexual exploitation of a minor via electronic means. After a jury trial, Defendant was convicted as charged. As a result of the convictions, Defendant received an effective sentence of twelve years in incarceration with 100% release eligibility. The trial court denied a motion for new trial and motion to reconsider the denial of the motion for new trial. Defendant appealed, arguing that the evidence was insufficient to support the convictions for attempted rape of a child and especially aggravated sexual exploitation of a minor. After a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and CAMILLE R. MCMULLEN, JJ., joined.

George Thompson and Newton Holiday (at trial), and Manuel B. Russ (at motion to reconsider motion for new trial and on appeal), Nashville, Tennessee, for the appellant, Adonis Donnell Holbrooks.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Deputy Attorney General; Glenn R. Funk, District Attorney General; and Jeremy D. Johnston, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Defendant was indicted in January of 2015 by the Davidson County Grand Jury for one count of especially aggravated sexual exploitation of a minor and one count of sexual exploitation of a minor via electronic means. In January of 2018, a superseding indictment charged Defendant with one count of attempted rape of a child, one count of solicitation of a minor, one count of especially aggravated sexual exploitation of a minor, and one count of sexual exploitation of a minor via electronic means.

At trial, the proof revealed that the victim, A.Q.,[1] received an iPod Touch for Christmas of 2013 when she was nine years old. An iPod Touch is a device similar to an iPhone except the iPod Touch only utilizes a WiFi signal and is not capable of utilizing a cellular signal. In May of 2014, the victim began receiving text messages from Defendant on her iPod Touch. The victim was still nine years of age at this time. The victim inquired whether the texts were coming from someone at school. Defendant responded, "hell no." Eventually, Defendant told the victim that his name was "Adons." The victim told Defendant that she was nine years old but also told him she was "just kidding," and that she was actually twelve years old.

After many text messages between the two, Defendant asked the victim to send him pictures of her vagina and breasts. The victim complied. She testified that she sent the pictures because she was scared. The victim told Defendant that she lived on a street that was close to her actual address. Defendant sent the victim pictures of his penis and nipples. The victim admitted that she asked Defendant for these pictures but explained that she did not actually understand what she was asking Defendant to send when she requested the pictures.

The victim explained that ordinarily, she deleted the messages from the iPod Touch but that she did not delete the messages she and Defendant exchanged on May 27, 2014. During this exchange, Defendant asked the victim if she had ever "suck[ed] dick," "b[ee]n fu[c]k[e]d," or "been ate out." The victim replied, "Yes[,] no[,] yes[.] [H]ave [yo]u ever humped have [yo]u ever suck pussy[,] have you ever been raped." Defendant replied, "Yes[,] Yes[,] Yes[,] by a girl . . . and I liked. Where's the pics of [yo]ur pussy." The victim sent an image of her vagina. Another time, the victim sent Defendant a picture of her face. Defendant's response to the picture of the victim's face was "[you]r cute." The victim asked Defendant for pictures of his face, "nibble," "ass," and "dick." Defendant sent pictures of his face and nipples to the victim. Defendant asked the victim whether she wanted Defendant to perform oral sex on her and when the victim wanted to have sex with Defendant.

---

[1] It is the policy of this Court to refer to minor victims of sexual abuse by their initials.

In another text message, Defendant acknowledged that he was "really way too old" for the victim and that he had children who were near the victim's age. Defendant expressed concern that the victim would tell his wife and/or his children about the messages. Despite his concern, Defendant asked the victim for her address.

On the day these messages were sent, the victim's mother randomly checked the victim's activity on the iPod Touch and discovered the messages exchanged between Defendant and the victim. The victim's mother sent a text to Defendant to "wait a minute" and then called the police. The victim's mother turned the iPod Touch over to police that day.

Detective Michael Adkins processed the iPod Touch. His investigation revealed that the telephone number communicating with the iPod Touch belonged to Defendant's wife but Defendant's name was also associated with the telephone number. Detective Adkins confirmed that Defendant's driver's license picture matched the picture of the man's face sent from the telephone number to the victim's iPod Touch.

Detective Adkins got permission from the victim's mother to pose as the victim on the iPod Touch in order to continue communication with Defendant. Detective Adkins testified that he had training in undercover messaging and chatting. During training he learned that he should avoid leading the conversation. Detective Adkins refrained from mentioning sex or exchanging photographs unless the other party to the conversation brought the subject up first.

Detective Adkins posed as the victim on the iPod Touch and responded to text messages sent by Defendant. After receiving several text messages from Defendant in which Defendant inquired about the victim's whereabouts, Detective Adkins responded by telling Defendant, "Mom took iPod away. Got it back this morning." Soon thereafter, Defendant inquired when they were "hook[i]n[g] up." Defendant also asked for "more pics of [the victim's] sexy ass." Detective Adkins, posing as the victim, complained that Defendant had not sent his own picture. Defendant responded that he would send a picture when he got off work at 4:00 p.m. Defendant sent a text that the victim was "way mature for [her age]." Detective Adkins responded, "[You] right not many 9 y[ear] o[lds] like me!"

Defendant tried to arrange a meeting with who he thought was the victim. Defendant asked for the victim's address and told her that he lived nearby. The following text exchange occurred between Defendant and Detective Adkins, posing as the victim:

Defendant: . . . [You] get out early Friday [yo]u wanna meet me somewhere[?]

[the victim]: Where[?]

Defendant: Depends on where [yo]u live[.]

[the victim]: I'm close to you[.]

Defendant: I get off at 11:30 am every Friday so [yo]u c[ou]ld b[e] walk[i]n[g] [i]n [yo]ur area and I come scoop [yo]u up or we meet behind [S]honeys or old [T]arget

[the victim]: What we gonna do[.]

Defendant: WHATEVA [YO]U WANNA DO BABY[.]   W[ha]t [yo]u wanna do?

[the victim]: I don't know[.]

Defendant: Touch[,] kiss[,] grind[,] suck[,] fuck[.]


Detective Adkins, posing as the victim, sent a text to Defendant stating that the victim lied about having sex. Defendant told the victim that it was "ok coo[l]." He sent a text stating, "If wanna have sex we can[,] I'll go easy on [yo]u but if [yo]u d[o]n[']t we won't." Defendant suggested that they could "get naked and grind," he could "eat [her] out," she could "suck" him, or they could "watch flicks on [his] phone."

Defendant asked the victim if she had siblings and if she was "home alone" on a regular basis. Eventually, Defendant suggested that they meet at Target at noon. The Target Defendant was referring to was closed and abandoned. Defendant told the victim to "try not to b[e] seen" and to meet him at the side of the store. Defendant again asked the victim if she wanted Defendant to show her "how to suck [a]n[d] fuck." The victim replied, "[s]ure." Defendant told the victim they need to be "real careful" so they "d[o]n[']t get caught." Defendant asked the victim if she was "ready for tomorrow" and wondered if she would "back out." Defendant assured the victim that he would "go easy" and would stop whenever the victim wanted him to stop.

On the day of the scheduled meeting, Detective Adkins, still posing as the victim, messaged Defendant that school was over and that the victim was headed to the prearranged meeting spot at Target. Several minutes later Detective Adkins texted Defendant to tell him that the victim had arrived at Target at the meeting spot. Unbeknownst to Defendant, police were monitoring his activity, and had followed him from his work location part of the way to Target. When Defendant arrived, he sent a text message to the victim asking for her location. Defendant drove to the front of the Target but did not stop. He continued driving to the Mexican restaurant next door and backed his car into a parking place. Police arrived on the scene and arrested Defendant. Defendant's phone was in the driver's seat and his conversation with the victim was

visible on the screen. Text messages preceding the message that the victim was out of school had been deleted from the phone. When police searched Defendant's car, they discovered an inflatable mattress, an electronic pump for the mattress, and a travel kit containing a condom and a tube of Vaseline.

Defendant testified at trial. He admitted that he had text message conversations with someone. However, Defendant insisted that the victim initiated the contact and that the contact information from the text messages was saved in his phone as "Preacher." Defendant explained that he met the victim's mother on a social media site called "Tagged" and that her screen name was "Preacher's Kid." Defendant had shortened the name to "Preacher" in his phone. When he received the text messages, he assumed they were from the victim's mother.

Defendant testified that the victim's mother admitted during a juvenile court hearing that she "may have" known him but that he had "longer hair." However, during her testimony at trial, the victim's mother did not recall ever testifying that she knew Defendant. The victim's mother admitted that she used "Tagged" with the name "P.K." which stood for "Preacher's Kid." The victim's mother also testified that she only exchanged messages directly through the website rather than by using her own email address. She denied pairing her email address to the victim's iPod Touch. A joint stipulation entered at trial stated that a forensic examiner located the messages on the iPod Touch and that the messages were exchanged between Defendant and the victim using the mother's email address and that the mother's email address was listed as the iCloud email address on the iPod Touch. Any messages sent to Defendant from the iPod Touch would have appeared to come from the victim's mother's email address.

Defendant explained that even though the text messages he received informed him that the victim was nine years old, the text messages also claimed that the victim was eighteen years old and twelve years old. Defendant claimed that he was under the impression that he was talking to the victim's mother who was "playing around." He continued the conversation in order to "figure out what was going on."

Defendant testified that he was "devastated" when he learned that he was talking to a nine-year-old child. Defendant admitted that he received pictures of the victim but claimed he did not think the picture was real or that a child would be able to text him throughout the school day. Defendant explained why he had items in his car at the time of his arrest. He claimed that the inflatable mattress was for his son, the condom was for "personal use" with his wife, and the Vaseline was for his lips.

Defendant employed an expert to perform a forensic examination of his phone, the victim's iPod Touch, and his own profile on "Tagged." According to the expert report,

there was no evidence that Defendant interacted with anyone on "Tagged." The report concluded there was "little evidence to support [Defendant's] position that he believed he was speaking with someone he previously met on Tagged who was of legal age, and thus he believed they were role playing during this incident."

At the conclusion of the proof, the jury found Defendant guilty of all four counts of the indictment: attempted rape of a child, solicitation of a minor, especially aggravated sexual exploitation of a minor, and sexual exploitation of a minor via electronic means. After a sentencing hearing, the trial court sentenced Defendant to an effective sentence of twelve years. Defendant filed a motion for new trial. There is no order denying the motion for new trial in the technical record on appeal, but a minute entry indicates that the trial court denied the motion for new trial. Trial counsel withdrew, and new counsel was appointed. New counsel filed a motion to reconsider the motion for new trial. The trial court struck the motion and this appeal followed.

*Analysis*

On appeal, Defendant challenges the sufficiency of the evidence with respect to his convictions for attempted rape of a child and especially aggravated sexual exploitation of a minor. Specifically, with respect to the conviction for attempted rape of a child, Defendant argues that the State "failed to demonstrate that [Defendant] took any substantial steps toward perpetrating the offense of [rape of a child]" and "failed to adduce sufficient evidence . . . [Defendant] actually conversed with [the victim]" about arranging the meeting. With respect to the conviction for especially aggravated sexual exploitation of a minor, Defendant argues that his actions "did not promote the creation of an image that depicted [the victim] 'in the performance of, or in the production of, acts or material that includes the minor engaging in' either 'sexual acts' or 'simulated sexual activity that is patently offensive." Defendant argues that the images on which the State relied to make its case against Defendant were not objectively lascivious, within the definition of sexual activity and its case law interpretation. The State disagrees, arguing that the evidence was sufficient to support the convictions.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the

strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

## I. Attempted Rape of a Child

Rape of a child is "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." *Id.* § 39-13-501(7). Criminal attempt occurs when a person "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(3). To qualify as a "substantial step," the person's "entire course of action" must be "corroborative of the intent to commit the offense." *Id.* § 39-12-101(b).

There is no statutory definition for "substantial step." *See* T.C.A. § 39-12-101(b), Sent. Comm'n Cmts. ("Because of the infinite variety of factual situations that can arise, subdivision (a)(3) leaves the issue of what constitutes a substantial step for determination in each particular case."). It has been described as a "heavily fact-intensive inquiry" that is best determined by looking at the particular facts of each case. *Davis*, 354 S.W.3d at 733.

In a light most favorable to the State, the proof established that Defendant sent text messages to the victim in which he asked her if she had ever "b[ee]n fu[*]k[e]d" and when she wanted to have sex with him, as well as other extremely explicit inquiries. Defendant tried several times to arrange a meeting with the victim and repeatedly asked

her where she lived. Defendant asked the victim how often she was home alone and if she could go out during the day before eventually suggesting they meet somewhere in secret. Defendant instructed the victim to meet him at an abandoned Target on the side of the building. Defendant messaged the victim (at this time Detective Adkins posing as the victim) that he would "go easy" on her if she wanted to have sex. Defendant even assured the victim that they could stop if she wanted. Defendant arrived at the meeting location at the time he specified and contacted the victim via text message when he arrived. When he was arrested, Defendant had a tube of Vaseline, a condom, and an inflatable mattress in his car. Though Defendant argues that his actions do not constitute a "substantial step toward the commission of the offense," we disagree.

In *State v. Fowler*, the Tennessee Supreme Court examined what actions would be sufficient to constitute a substantial step in a case involving attempted statutory rape. 3 S.W.3d 910 (Tenn. 1999). In *Fowler*, the defendant stopped at a rest area that had a reputation as an area for homosexual activity. Defendant approached an undercover officer and inquired about meeting a young male for sex. *Id.* at 911. The officer told the defendant he would accept money as a finder's fee for a twelve-year-old boy. *Id.* One hour later, the defendant met with the officer. *Id.* The officer brought along a person he presented as an underage boy but who was actually a nineteen-year-old man dressed to appear under age. *Id.* When the defendant wrote the officer a check, he was arrested and convicted of attempted statutory rape. *Id.* On appeal, the defendant argued that there was no substantial step. The supreme court disagreed, determining that to require "conduct beyond the defendant's conduct in this case would be inconsistent with the general goal of crime prevention" and would "create a dangerous precedent by requiring that the defendant take delivery of the boy or actually begin some act that would approach sexual penetration." *Id.* at 912. The same rationale applies here. The victim had exchanged photographs with Defendant, told him the area in which she lived, and Defendant had arranged to meet the victim at Target. When Defendant arrived, he was prepared to have sex with the victim as evidenced by the inflatable mattress, condom, and Vaseline in his vehicle.

Defendant also argues that he actually arranged to meet with Detective Adkins, posing as the victim, and therefore he could not be convicted of attempted rape of a child because he did not agree to meet with a child. Again, we disagree. The State was only required to prove that Defendant believed he was going to have sex with a child under the age of thirteen. T.C.A. § 39-12-101(a)(3). Defendant admitted during his testimony that the victim told him that she was nine or twelve. Defendant's text messages indicated that he knew he was "too old" for the victim and that he had children of his own that were similar in age to the victim. Additionally, Defendant told the victim that she was "mature" for her age and acknowledged that he would "go easy" on her because she had not had sex. A reasonable jury could conclude that Defendant believed he was meeting a

child under the age of thirteen for sex and that he took a substantial step toward the commission of the offense. The evidence was sufficient to support the conviction.

*II. Especially Aggravated Sexual Exploitation of a Minor*[2]

Especially aggravated sexual exploitation of a minor provides that "[i]t is unlawful for a person to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance of, or in the production of, acts or material that includes the minor engaging in: (1) Sexual activity; or (2) Simulated sexual activity that is patently offensive." T.C.A. § 39-17-1005(a). "'Promote' means to finance, produce, direct, manufacture, issue, publish, exhibit or advertise, or to offer or agree to do those things." T.C.A. § 39-17-1002(6). "Sexual activity" in the context of this case means "[l]ascivious exhibition of the female breast or the genitals, buttocks, anus, or pubic or rectal area of any person." T.C.A. § 39-17-1002(8)(G).

Defendant argues that the images in question are not lascivious. Appellate review of the determination of lasciviousness is a mixed question of fact and law. *See State v. Whited*, 506 S.W.3d 416, 427 (Tenn. 2016).

> The appellate court must review the finding by the trier of fact that the depiction is a lascivious exhibition, including underlying factual issues such as the extent to which the minor appears nude or whether the minor appears to be portrayed in a sexually suggestive manner. *See [United States v.] Rayl*, 270 F.3d [709,] 714 [(8th Cir. 2001)]. In addition, looking at the evidence in a light most favorable to the verdict, the appellate court must determine whether the depiction is legally sufficient to constitute a "lascivious exhibition" within the meaning of the statute. The latter determination is a question of law subject to plenary review. *Id.*

506 S.W.3d at 427.

Although "lascivious exhibition" does not have a statutory definition, our supreme court addressed it extensively in *Whited*. Noting that a determination of lasciviousness is "'an intensely fact-bound question,'" the court stated that "it is generally accepted that mere nudity, without more, is insufficient to establish a lascivious exhibition of private body areas." *Id.* at 431 (quoting *United States v. Schuster*, 706 F.3d 800, 806 (7th Cir. 2013)). In *Whited*, the defendant surreptitiously recorded his victims doing ordinary, daily activities: entering and exiting the shower, using a towel to dry off, grooming, and

---

[2] On appeal, the State's brief with regard to this issue was filed under seal pursuant to an order issued by this Court.

changing clothes. 506 S.W.3d at 442. Each of the videos at issue "depict[ed] nudity of a minor or minors to varying degrees," but the camera never focused exclusively on the victims' private areas, and "nothing in the videos indicate[d] that the victims were posed or coached; they [were] not in any unnatural or overtly sexual poses and appear[ed] unaware of the camera." *Id.* at 442, 446. Although finding the "question [to be] close," the court held that the videos did not rise to the level of lascivious exhibition primarily because the minor victims were "engag[ed] in everyday activities that [were] appropriate for the settings and [were] not sexual or lascivious within the ordinary meaning of those terms." *Id.* at 447. The court discussed the factors recited in *United States v. Dost*, 636 F. Supp. 828, 832 (S.D. Cal. 1986), declining to adopt them but determining that they were relevant to a court's analysis. *Whited*, 506 S.W.3d at 437, 441. The *Dost* factors are:

> (1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;
> (2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;
> (3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;
> (4) whether the child is fully or partially clothed, or nude;
> (5) whether the visual depiction suggest sexual coyness or a willingness to engage in sexual activity;
> (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Dost*, 636 F. Supp. at 832.

In a most recent Tennessee Supreme Court case, *State v. David Scott Hall*, No. M2015-02402-SC-R11-CD, ___ S.W.3d ___, 2019 WL 117580, at *1 (Tenn. Jan. 7, 2019), the defendant hid a camera inside the victim's bedroom. The victim discovered the camera soon thereafter, as she entered her bedroom after taking a shower. She was fully-clothed at the time. 2019 WL 117580, at *1. The recording revealed that the defendant had entered the bedroom, placed the camera such that a person's torso was visible from mid-thigh to shoulder, looked around the room, and then left. *Id.* at *2. The supreme court noted that the camera was not zoomed in such that the focal point of the shot was clearly a genital or intimate body part. *Id.* at *13. The court determined that the evidence was insufficient to establish that the defendant attempted to produce a lascivious exhibition because it was not clear that he intended to capture anything more than nudity. *Id.* at *19. In *Hall*, the court discussed the factual similarities of that case with *Whited*, citing in particular the wide angle of the camera, the absence of sexual activity, and the victims' lack of awareness of the camera. 2019 WL 117580, at *13. The court also

noted that "nudity combined with other factors—such as the nature of the nudity depicted, emphasis or focus on private body areas, [or] posing or coaching of the minor by the defendant . . . could be sufficient to make the depiction a lascivious exhibition." *Id.* at *9.

The dissent in *Hall* recognized that not unlike *Whited*, the particular facts presented in both cases were "close questions." *Id.* at *22 (Page, J., dissenting). Here, the question is not a close one. In a light most favorable to the State, the proof at trial establishes that Defendant "direct[ed]" the victim to send images of her vagina to Defendant via text message. *See* T.C.A. § 39-17-1002(6). The text messages show that the victim asked Defendant for a picture, to which Defendant replied "[yo]u first." However, before the victim could send the images, Defendant asked the victim "[w]here's the pics of [yo]ur pussy . . . ." The focal point of the image is the vagina of a nine-year-old girl. The image sent by the victim to Defendant is a close-up photograph of her vagina, taken underneath or partially underneath her clothing. This is certainly more than mere nudity and could certainly be construed as "unnatural" and "overtly sexual." *Whited*, 506 S.W.3d at 446. The picture was sent during a text message thread about sex and sexual activity. The photograph was focused on the victim's private area. The victim was coached to take the photograph by Defendant, and the photograph was overtly sexual. The victim was certainly aware of the camera because she made the photographs at Defendant's promotion. The victim was not engaging in an everyday activity that was appropriate for the setting. The picture was sexual and lascivious within the ordinary meaning of those terms. *Whited*, 506 S.W.3d at 437, 441.

Viewing this evidence in a light most favorable to the State, we find that the evidence adduced at trial sufficiently established Defendant's conviction for especially aggravated sexual exploitation of a minor. Defendant is not entitled to relief on this issue.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE

- 11 -